IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 1:25-cr-00123-CNS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ISHMAEL PETTY,

    Defendant.

**ISHMAEL PETTY'S MOTION FOR TRANSFER TO A LOCAL DETENTION FACILITY**

Ishmael Petty, through counsel, moves pursuant to the Fifth, Sixth, and Eighth Amendments to the Constitution for an Order directing that Mr. Petty be transferred to the Federal Detention Center - Correctional Institution–Englewood (FDC/FCI Englewood) in Littleton, Colorado or other local detention facility until after the trial of this matter. Mr. Petty requests an evidentiary hearing on this motion.

## Introduction

Since October 16, 2017, Ishmael Petty has been housed in the most isolated section of the most isolating prison operated by the Bureau of Prisons. Put simply, the conditions of his long-term isolation constitute torture. The government should not be permitted to seek the ultimate punishment of death and simultaneously hold Mr. Petty under conditions that seriously interfere with his ability to defend this case. It is imperative that Mr. Petty have ready access to his attorneys and defense team throughout these proceedings. He must be housed under humane conditions that do not continue to

degrade his mental health and which permit him a full opportunity to defend this case.

We ask this Court to issue an order directing the BOP to transfer Mr. Petty to FDC/FCI Englewood or another local detention facility. If housed at Englewood, members of Mr. Petty's defense team would be able to visit him in person several times a week, alleviating the effects of his isolation and segregation and facilitating Mr. Petty's ability to assist in his defense. A transfer to Englewood would also mitigate against the government's attempt to manipulate the future dangerousness analysis and permit a fair opportunity for both sides to address this important issue.

## **Factual Background**

Mr. Petty's previously filed Motion for Preservation of Evidence (Doc. 25), details how Mr. Petty has been confined in extreme isolation for over seven years. Mr. Petty incorporates that filing by reference and briefly summarizes the key points here.

Range 13 is reportedly the most isolated and secure area of the BOP's Administrative Maximum's facility (ADX), which makes it perhaps the most isolated part of any prison in the United States. Range 13 is comprised of four single-inmate cell "suites" designed to ensure zero physical contact between inmates. Inmates are prohibited from being in the shared areas at the same time and the design of Range 13 keeps inmates from being able to visually see or communicate with each other. All movement within their cell suites is controlled by remotely operated doors so there is little interaction with staff. An ADX psychologist candidly described the conditions: "You have no contact, you don't speak to anybody, and it's a form of torture on some level." Office of the Inspector General, Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness (July 2017) (https://oig.justice.gov/reports/2017/e1705.pdf).

Mr. Petty was initially confined on Range 13 for seven months in 2013-2014 following an assault of staff members. He was again moved to Range 13 for a short stay in May 2017. In October 2017, Mr. Petty was moved to Range 13 and has stayed there since. At the time of Mr. Hillard's death, Mr. Petty had been held in these conditions amounting to torture for nearly three years. It's now been seven years and counting.

Other housing units at ADX—such as the Control Unit or the unit referred to as General Population at the ADX—have published procedures that govern when an inmate can be placed there, how long a placement may last, and how an inmate can earn his way out. No such guidance applies to Range 13. No policy governs how long an inmate can be held on Range 13. An inmate has no way of knowing how they can earn their way out of Range 13. Or what process may be used to determine whether they stay. The Warden of ADX appears to have total discretion to hold someone on Range 13 indefinitely.

The Wardens of ADX have exercised that discretion and tortured Mr. Petty in the most isolated cell in the most isolated unit in the most isolating prison in the United States for more than seven years. As detailed below, this placement severely impacts the attorney-client relationship and Mr. Petty's ability to assist his attorneys. Now that the government has chosen to seek death and his literal life is on the line, Mr. Petty asks the Court to intervene and order that he be transferred to a humane setting where he can meaningfully assist his defense.

### **Transfer to the FDC/FCI-Englewood Is Necessary to Protect Mr. Petty's Constitutional Rights**

The United States is seeking a death sentence against Mr. Petty. While the government may lawfully incarcerate individuals awaiting trial, it may not do so in a way that interferes with their ability to prepare and present a defense. That Mr. Petty is also

serving a sentence for previous convictions does not diminish his constitutional rights. Mr. Petty is presumed innocent on the current charges and is guaranteed due process under the Fifth Amendment and the effective assistance of counsel under the Sixth Amendment to the United States Constitution. Transfer to another facility is necessary to ensure Mr. Petty is not deprived of these fundamental trial rights.

### A. This Court Has the Power To Order Mr. Petty's Transfer To Protect His Fundamental Rights

The right to effective assistance of counsel begins long before a jury is empaneled. In fact, the Supreme Court has recognized that pretrial conditions of confinement which effectively deprive a person of counsel "may be more damaging than denial of counsel during the trial itself." *Maine v. Moulton*, 474 U.S. 159, 170 (1985). This Court is empowered to order the government to transfer a pretrial detainee or take other measures to ensure his fundamental trial rights are protected. *United States v. Barclay*, 442 F.Supp.3d 1312, 1315 (D. Idaho 2020); *see also Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) (restrictions imposed by prison may violate constitutional rights); *Ervin v. Busby,* 992 F.2d 147 (8th Cir. 1993) ("a detainee's constitutional rights may be infringed" by transfer between facilities or other circumstances). As set forth below, an order requiring Mr. Petty be transferred out of the ADX is necessary to ensure his constitutional rights are respected throughout this capital prosecution.

### B. By Seeking to Execute Mr. Petty, the Government Has Triggered Heightened Constitutional Protections

The Supreme Court has repeatedly reinforced that courts must approach death penalty cases differently. *See*, *e.g.*, *Ring v. Arizona*, 536 U.S. 584, 605-06 (2002) ("no doubt that '[d]eath is different'"); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (death is

4

"qualitatively different"). In recognition of the uniqueness of a capital case, the Supreme Court "has been particularly sensitive to insure that every safeguard is observed." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). The possibility of a death sentence requires special standards of practice, including thorough, in-person investigation and close, trusting attorney-client relationships. Courts must ensure that a defendant's constitutional rights are even more closely guarded than in a typical criminal prosecution. Mr. Petty's current conditions of confinement interfere with his ability to defend these charges, his ability to interact with counsel, and degrade his physical and mental health in a way that cannot be permitted to continue.

**C. The Torture of Mr. Petty on Range 13 Interferes with His Ability to Assist Counsel and Participate in His Defense**

Perhaps the most important right to a defendant in a death-penalty prosecution is the Sixth Amendment right to the effective assistance of counsel. Indeed, Congress has recognized that a capital case requires a unique level of contact between an accused and his lawyers and thus has required that lawyers in capital cases "shall have *free access* to the accused at all reasonable hours." 18 U.S.C. § 3500 (emphasis added).

Counsel serves a more consequential role in capital cases than in any other kind of criminal matter, largely due to the need for counsel to investigate and develop all available mitigation information. "[M]itigation evidence [can] complete, deepen, or contextualize the picture of the defendant presented by the prosecution [and] can be crucial to persuading jurors that the life of a capital defendant is worth saving." *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005). To that end, counsel must conduct a thorough investigation into all potentially relevant mitigation evidence. *See Williams v. Taylor*, 529 U.S. 362, 396. Discharging this obligation requires that a heightened level of attorney-client trust and

5

cooperation be established and maintained throughout a capital case.

Because of the qualitatively different representation that must be provided in capital or potentially capital cases, the American Bar Association has special standards for the qualifications and performance of defense counsel. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003), 31 Hofstra Law Review 913 (2003) (hereinafter Guidelines). Central to the effective performance of capital counsel is the development of a relationship of trust with the client. As the ABA Guidelines reflect:

> Establishing a relationship of trust with the client is essential both to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense, and to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea.

Guideline 10.5, commentary; *see also* Guideline 10.11(C) ("[m]ultiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation").

Capital defendants will often have an inherent distrust of defense counsel—particularly appointed counsel—which will require even greater efforts to overcome that distrust. It is recognized that in such cases "it is much more difficult to establish a relationship of trust with the client." Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care*, 1993 U. Ill. L. Rev. 323, 337 (1993). The ABA Guidelines acknowledge that capital defendants will often have inherent limitations that impact the development of a relationship of trust:

> Many capital defendants are, in addition, severely impaired in ways that make effective communication difficult: they may have mental illnesses or personality disorders that make them highly

6

> distrustful or impair their reasoning and perception of reality; they may be mentally retarded or have other cognitive impairments that affect their judgment and understanding; they may be depressed and even suicidal; or they may be in complete denial in the face of overwhelming evidence.

Guideline 10.5, commentary. The development of a relationship of trust may also be hindered by a defendant's relationships with prior counsel.

> Often, capital defendants have had bad prior experiences with appointed attorneys, leading them to view such attorneys as "part of the system" rather than advocates who will represent their interests. Appointed capital defense attorneys sometimes exacerbate this perception by harshly criticizing their clients's [sic] conduct or making it clear that they are reluctant to represent them. A capital defendant who experiences, or previously has experienced, these kinds of judgments understandably will be reluctant to trust his attorney.

White, *supra*, at 338; *see also* Guideline 10.5, commentary ("Often, so-called 'difficult' clients are the consequence of bad lawyering—either in the past or present.").

"Overcoming barriers to communication and establishing a rapport with the client are critical to effective representation." Guideline 10.5, commentary. To overcome mistrust, "the lawyer must be patient, try to understand the client's view of reality, and demonstrate loyalty. Lawyers often can demonstrate loyalty by assisting clients with their immediate problems." White, *supra*, at 338. Access to their client is essential to foster a relationship.

A capital defendant must participate in his defense to a greater extent than any other criminal defendant. He must not only defend his innocence but also to assist his counsel in collecting evidence of his character and background, including, where it exists, evidence of mental health issues, hardship and deprivation, and positive attributes. As the ABA Guidelines recognize, a defendant is not likely to provide information leading to the development of such key mitigating evidence unless he deeply trusts his counsel.

The current defense team have spent a great deal of time working to develop the trust necessary to ensure Mr. Petty can be a valuable source of necessary information for investigation of the facts of the case against him and potential avenues of mitigation. The BOP's continued indefinite confinement of Mr. Petty on Range 13 at the ADX negatively affects his attorney-client relationship. Mr. Petty's defense team is based out of Denver, but also includes persons from throughout the country. The ADX is over two hours from the Denver metro area, requiring a total of five hours of travel at least, and often an overnight, for his defense team members to visit him. For defense team members based out of state, visiting Mr. Petty at the ADX is even more burdensome, requiring a plane flight to Denver and an additional lengthy drive.

ADX staff circumscribes when and how counsel can meet with Mr. Petty. Weekday legal visits are restricted to Thursdays and Fridays. All such visits must be scheduled with advance notice. These conditions make routine visits difficult, and make it impossible to respond to the unanticipated twists and turns of litigation. For instance, when Mr. Petty's arraignment was continued last Friday, ADX staff did not facilitate a call with counsel so counsel could update Mr. Petty, despite several requests to do so. On Monday, Mr. Petty was left in isolation to wonder why he was not being transported to Denver as expected. He also wondered why he was not hearing from his attorneys. Counsel was unable to discuss this schedule change (or anything else) until a phone call on Wednesday, three days later. If Mr. Petty was housed in the Denver Metro area, counsel could have gone to see Mr. Petty in person on Friday when the resetting order was issued, which would have significantly alleviated his distress. These kinds of unanticipated developments will continue as the case progresses. For counsel to maintain a trusted relationship with their

client, it is essential that they have ready access to Mr. Petty.

Additionally, by continuing to hold Mr. Petty on Range 13 in conditions recognized to be torture, the BOP is interfering with Mr. Petty's ability to assist in his defense by degrading his mental health. The terrible impact of extreme, long-term isolation such as being on Range 13 is thoroughly documented. "Prolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized." *Porter v. Clarke*, 923 F.3d 348, 357 (4th Cir. 2019). "Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances." *Lopez*, 327 F.Supp.2d at 143-44; S. Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L & Pol'y 325 (2006).

Studies demonstrate that solitary confinement can cause "anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations," among many other symptoms. *See* Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124, 130 (2003). "[E]ven a few days of solitary confinement will predictably shift the [brain's] electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium." Grassian, *supra*, at 331.

The extreme isolation of Range 13 inflicts psychological torment that is impeding Mr. Petty's ability to assist his counsel in developing mitigation for his defense. Mr. Petty has been held in conditions that amount to torture for more than seven years. It is essential that the conditions of his confinement do not continue to aggravate his mental health during the pendency of this case. Mr. Petty's isolation on Range 13, and the suffering he continues to endure, makes it impossible for him to reveal the intimate details of childhood

trauma, symptoms of mental illness, and other sensitive topics needed for mitigation. Due Process requires that Mr. Petty be able to fully engage with counsel and he must be held in a setting that supports (not degrades) his ability to do so.

**D. The Government Should Not Be Permitted to Build Its Case For Future Dangerousness Through Restrictive Pretrial Confinement**

The government has alleged that one of the statutory factors supporting imposition of the death penalty for Mr. Petty is "future dangerousness." By doing so, the government has put at issue whether Mr. Petty can safely be housed in an ordinary prison facility should his life be spared. *See, e.g., Unites States v. Basciano*, 763 F.Supp.2d 303, 352 (E.D.N.Y. 2011) (when only sentencing options are death or life in prison future dangerousness must be considered in prison context); *United States v. Umana*, 2010 WL 1688441, at *2-3 (W.D.N.C. April 26, 2010) (defense permitted to call two expert witnesses to testify as to whether defendant can safely be housed in prison to rebut suggestion of future dangerousness). The importance of "future dangerousness" evidence in a death penalty case cannot be overstated. Research shows that one of the most important factors to capital jurors is "keeping the defendant from ever killing again." Blume, John H., Garvey, Stephen P. & Johnson, Sheri Lynn, *Future Dangerousness in Capital Cases: Always "At Issue"*, 86 Cornell Law Review 397 (2001).

Having made Mr. Petty's "future dangerousness" an issue in this case, the government cannot be allowed to put their proverbial "thumb . . . [on] death's side of the scale" through the conditions of pretrial confinement. *Stringer v. Black*, 503 U.S. 222, 235 (1992). The government will argue at trial that Mr. Petty cannot be safely housed in prison as justification for why he must be sentenced to death. It should not be permitted to buttress its position by keeping him in the most isolated conditions possible while charges

are pending, particularly when doing so deprives Mr. Petty of the ability to present evidence to the contrary. How is Mr. Petty supposed to show that a death sentence is not required to ensure safety if he is not given an adequate opportunity to demonstrate that it is so?

The Supreme Court has recognized this conundrum and held that a defendant facing a possible death sentence must be afforded an opportunity to present evidence of good behavior in prison. *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986) (finding an Eighth Amendment violation to exclude evidence of a defendant's good behavior in prison). Other courts have similarly recognized that holding a defendant facing the death penalty in restrictive pretrial confinement improperly "limits the amount and kind of mitigating evidence that a capital defendant might bring in the penalty phase." *United States v. Lopez*, 327 F.Supp.2d 138, 144 (D.P.R. 2004).

In *Lopez*, the court evaluated a defendant's placement in segregated housing pending his death penalty trial. The court held an evidentiary hearing where testimony was received from the warden of the facility about the conditions of confinement and why the prison believed restrictive custody was appropriate. *Id*. at 139. After hearing this evidence, the court concluded the defendant's placement was "excessive, arbitrary, and punitive." *Id*. at 144. The court was concerned from a constitutional perspective about how isolation would impact Mr. Lopez's mental health and ability to assist his defense. On future dangerousness, the court stated:

> Placement in SHU limits the amount and kind of mitigating evidence that a capital defendant might bring in the penalty phase. In *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), the Supreme Court held that "a defendant's disposition to make a well-behaved and peaceful adjustment to prison life is by itself an aspect of his character that is by nature

11

> relevant to the sentencing determination." *Id*. at 7, 106 S.Ct. 1669. From this inability to present mitigating evidence, a factfinder might conclude that his continued placement in SHU implies "future dangerousness," in turn denying Defendant his due process right to contest that showing.
>
> In *Gardner v. Florida,* 430 U.S. 349, 362, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Supreme Court held that a defendant may not be sentenced to death "on the basis of information which he had no opportunity to explain or deny." It is constitutional error to place a "thumb ... [on] the death's side of the scale." *Stringer v. Black,* 503 U.S. 222, 235, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). By enacting a capricious unwritten policy, the Government is crafting an "atmosphere of death" in capital cases by imposing unreasonable and unwarranted conditions of confinement, while simultaneously restricting Defendants ability to "explain or deny."

*Id*. at 144. The court ultimately concluded that the Bureau of Prison's decision to house Lopez in restrictive custody because he was facing a death sentence was "perverting the principle reiterated by the courts that death is different." 327 F.Supp.2d at 145.

If the Court permits the government to continue housing Mr. Petty on Range 13 during the pendency of this case, it risks being perceived as endorsing the BOP's claim that Mr. Petty cannot safely be housed outside of Range 13, which is one of the key issues in this case. His current custody placement makes it difficult for Mr. Petty to demonstrate he can be safely housed elsewhere and deprives him of the ability to present important mitigating evidence. The government should not be permitted to build its case for future dangerousness while simultaneously denying Mr. Petty the ability to rebut this evidence.

### E. Placement at FCI-Englewood Protects Mr. Petty's Constitutional Interests Without Sacrificing Any Security Concerns

Mr. Petty asks the Court to order that he be transferred to FDC/FCI-Englewood during the period of his pretrial confinement. The relief requested here is the kind of

tailored remedy appropriate in these circumstances. *United States v. Morrison*, 449 U.S. 361, 364 (1981). In *Barclay*, which was not even a capital case, the district court found the conditions of confinement impaired the ability of counsel and client to communicate effectively and privately. Granting the motion for transfer, the court observed the primacy of a defendant's constitutional trial rights over administrative convenience of the prison system:

> Indeed, when the interest in effectively administering a federal detention center conflicts with a detainee's constitutional rights, it is clear which must give way. Where a pretrial detainee's right to a speedy trial or access to counsel is infringed by their conditions of imprisonment, the Court has the power and duty to protect the detainee's rights.

*Barclay*, 442 F. Supp. 3d at 1317.

Because Mr. Petty faces capital prosecution, the need for heightened procedural protections of his rights is even more pronounced than *Barclay*. Mr. Petty has a significantly greater need to be in regular contact with counsel and trust is even more important. Mr. Petty is also subject to significantly more harsh conditions of confinement than were at issue in *Barclay*. While the *Barclay* defendant's main complaint was that he was in a different state from his attorneys, Mr. Petty is held in extreme isolation every day, as he has been for more than seven years. And the *Barclay* court was not concerned at all about future dangerousness as that was not a capital case.

The appropriate relief here is to order the government to house Mr. Petty in a local detention facility. While still a secure setting, such a move would enable increased, more frequent contact between Mr. Petty and his defense team, a key component of maintaining a productive attorney-client relationship. It would facilitate the opportunity for him to develop mitigating evidence by allowing regular contact with social workers, mental health

professionals, and other supportive team members. Finally, it would allow Mr. Petty a greater opportunity to demonstrate that he can thrive in a less restrictive prison setting, which is a crucial component of his defense given the "future dangerousness" allegation.

While the government has suggested Mr. Petty must remain at ADX and can only be transported by specially trained BOP employees, the record shows otherwise. In 2015, Mr. Petty was indicted on federal charges arising from the assault on three staff in the ADX. *See United States v. Petty*, Case No. 1:15-cr-29-PAB. By that time, Mr. Petty was also already serving a life sentence in the BOP for murder of another inmate at USP Pollock in 2002. Despite Mr. Petty's alleged security risks as of 2015, the United States Marshals transported Mr. Petty for all court proceedings, including trial. *See* Case No. 1:15-cr-00029-PAB (Doc. 23) (describing transport process). There were no incidents, no breaches of security, nor any attempted breaches of security by Mr. Petty. Throughout the proceedings, Mr. Petty was polite, respectful, and compliant with the Marshals.

Further, FDC/FCI Englewood has the capability to and frequently houses high-security inmates, including those facing murder charges for prison killings, like the allegations in this case. These facilities are currently housing Jonathan Guillory and Anthony Bell, both of whom are charged with a first-degree murder from USP Florence in Case Number 23-cr-000391-RMR (D.Colo.). Eleke Davis was housed there throughout the government's prosecution of him for a first-degree murder from USP Florence in Case Number 22-cr-00016-RMR (D.Colo.).

The Marshal service is equipped to handle transport and is the appropriate division of the executive branch to facilitate Mr. Petty's movement between court and jail. 28 U.S.C. § 566(a), (c). The U.S. Marshals routinely handle high security situations and have

the training and capability to transport and maintain custody of BOP prisoners like Mr. Petty. *See, e.g.,* USMS Policy Directive 9.21, *In-District Prisoner Movements* (permitting Marshals to utilize measures such as full restraints and other security protocols to ensure safe transport).

Requiring that Mr. Petty be confined at the Englewood campus during the pendency of this case appropriately balances his Constitutional rights with any security concerns expressed by the government.

## **Conclusion**

Ishmael Petty respectfully requests that this Court set an evidentiary hearing, unless the Court is prepared to grant this motion after the issue is fully briefed. For the reasons discussed herein and further developed at any such hearing, he further asks this Court to grant the motion and order the government to transport and house Mr. Petty for pretrial detention at FDC/FCI Englewood, or other local detention center this Court deems appropriate until this matter is resolved. Mr. Petty further requests this Court order the US Marshals to transport him to and from court proceedings, and to maintain custody of him in court.

Defense counsel has conferred with the government, and government counsel opposes this motion.

Respectfully submitted this 25th day of April, 2025.

*s/ Patrick J. Burke*
Patrick J. Burke, #4943
Patrick J. Burke, P.C.
303 16th Street, Suite 200
Denver, Colorado 80202
303-825-3050
Patrick-j-burke@msn.com

*s/ David G. Maxted*
David G. Maxted, #52300
Maxted Law LLC
1543 Champa Street, Suite 400
Denver, Colorado 80202
720-717-0877
Dave@maxtedlaw.com

*s/ Jamie Hubbard*
Jamie Hubbard, #48552
Stimson LaBranche Hubbard, LLC
1652 Downing Street
Denver, Colorado 80218
720-689-8909
Hubbard@slhlegal.com

**Attorneys for Ishmael Petty**

16

## CERTIFICATE OF SERVICE

      I hereby certify that on April 25, 2025, I electronically filed the foregoing **ISHMAEL PETTY'S MOTION FOR TRANSFER TO A LOCAL DETENTION FACILITY** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties of record.

                              *s/ Nancy Hickam*
                              Nancy Hickam, Paralegal