IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Criminal Case No. 1:25-cr-00123-CNS-1

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ISHMAEL PETTY,

      Defendant.

---

**ORDER**

---

Before the Court is Defendant's Motion to Disqualify. ECF No. 202. It's denied.

## I.      BACKGROUND

This is a capital case with a lengthy factual and procedural background. The Court recites only those facts relevant to its resolution of Defendant's disqualification motion.

The government indicted Defendant in April 2025, for Defendant's alleged murder of another inmate in the Administrative Maximum Security Facility in Florence, Colorado (ADX). *See* ECF No. 1 at 1. The government filed a notice of intent to seek the death penalty that same month. *See* ECF No. 7. During a January 22, 2026, status conference, the Court stated that "it would be helpful for the Court to do a tour of the facility." ECF No. 140 at 8. It specified that "[b]oth sides would need to be there, obviously, for that tour." *Id.* The Court permitted both parties to file objections as to this tour by February 2, 2026. *See* ECF No. 140 at 8. No party objected to such a tour by this deadline. The tour was eventually scheduled for March 24, 2026. *See, e.g.,* ECF No. 202 at 3.

1

Prior to this tour, the parties disputed which areas of ADX were appropriate for touring. Counsel for Defendant urged several, including "[i]nside the door across from Cell 40," as well as the "C Unit Bubble." ECF No. 202-2 at 3–4. The government responded that the tour would not include several areas, including these, citing "significant security efforts." *See id.* at 2–3. Defense counsel argued that a tour of these areas was necessary to show how "ADX staff manipulate the temperature of [Defendant's] cell and the temperature of [Defendant's] water from the pipe chase to Cell 40," ECF No. 202-3 at 1, and, as for the C Unit Bubble, how a tour would "help the Court [determine] the extent of the audio & video capabilities in question," *id.* at 2. Further, a tour of the C Unit Bubble would give the Court "an understanding of what views were available to when the incident on 9/19/2020 occurred," and that seeing whether "[BOP] staff have to change screens to monitor what is happening in Cell 40 . . . is also relevant to the government's claim . . . that [Defendant] is a future danger." *Id.* The government responded to these arguments, contending that ADX's Warden had not authorized a tour beyond Cells 30 and 40. *See id.* at 1. The Court communicated it was "fine to proceed" with the tour of Cells 30 and 40 as authorized by the Warden, but also indicated it would like to also view the door across from Cell 40 and the fire exit, as well as—given the "pending issues concerning video footage" at the time—the C Unit Bubble. *Id.* at 1. No response was received from the Warden or the government.

The Court conducted its tour—accompanied by counsel for Defendant and the government, as well as its two law clerks—on March 24, 2026. *See, e.g.,* ECF No. 202 at 5. Prior to conducting the tour, the Court had an introductory conversation with the Warden and ADX attorney Brandon Willms. After this, the Court toured, along with the

2

parties, the C Unit of Range 13, specifically Cells 30 and 40, and their indoor and outdoor recreation areas. The Court then briefly viewed the C Unit Bubble with the Warden and Attorney Willms. The Court also briefly viewed the door across from Cell 40 with the Warden and Attorney Willms.[1] The Court encouraged the parties to confer regarding access to the same door, and to file a motion for access if they could not reach agreement as to the same. Following this, the Court, along with the parties, Warden, and Attorney Willms, completed the tour, and exited ADX.

On April 7, 2026, the Court denied without prejudice Defendant's Motion to Compel Production of Audio and Video Footage Preserved Under Court Order, granted the government's Motion to Clarify, and denied without prejudice Defendant's Motion for Evidentiary Hearing on BOP's Audio and Video Recording Capabilities on Range 13. *See* ECF No. 188 at 12. The Court's order was concerned entirely with interpreting its prior preservation orders and their scope. *See, e.g., id.* at 5. And to the extent that Defendant's motion for an evidentiary hearing was denied, the Court denied such motion based on its analysis of Defendant's motion to compel. *See id.* at 11 ("In light of the Court's order on Defendant's motion to compel, the Court DENIES WITHOUT PREJUDICE Defendant's motion for an evidentiary hearing.").

Defendant filed the instant disqualification motion on April 24, 2026. ECF No. 202. During its pendency, the Court held a status conference regarding the scheduling order, after which it adopted several initial deadlines related to discovery requests and constitutional motions in part. *See generally* ECF No. 205. The instant motion is fully briefed.

---

[1] Defendant acknowledges that the Court simply viewed these areas. *See* ECF no. 210 at 2 (characterizing the Court's conduct as "private viewings").

## II.    DISCUSSION

Defendant moves to disqualify under 28 U.S.C. § 455(b)(1) and § 455(a). *See* ECF No. 202 at 1. The Court considers and rejects Defendants' disqualifications arguments that attend each statutory provision in turn.

### A.  28 U.S.C. § 455(b)(1)

Section 455(b)(1) provides that any judge "shall . . . disqualify himself . . . where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." Defendant contends disqualification under this provision is required because, during the tour, the Court "obtained information . . . from extrajudicial sources during ex parte communications." ECF No. 202 at 1. The Court disagrees that Defendant has shown any events that occurred during the tour warrant the Court's disqualification under this provision. *See also United States v. Page*, 828 F.2d 1476, 1481 (10th Cir. 1987) ("We note finally that the decision to recuse is left to the sound discretion of the judge." (citing *Shadid v. Oklahoma City*, 494 F.2d 1267, 1268 (10th Cir. 1974)).

To understand why, it's important to provide content to § 455(b)(1)'s standard. I.e., to understand what exactly "personal knowledge" does—and does not—mean. The Court focuses on the meaning of this statutory phrase, given that Defendant does so himself in advancing his § 455(b)(1) arguments. *See* ECF No. 202 at 14 (arguing that "to mandate disqualification, the judge's 'personal knowledge' of the disputed facts must come from an 'extrajudicial source'" (citation modified)).

Defendant is correct that § 455(b)(1) "applies to knowledge which the judge obtained extrajudicially, *e.g.*, through prior representation of a party, or by witnessing the

4

events at issue in the proceeding." *Page*, 828 F.2d at 1481. But "extrajudicial" means just that—conduct that is "not judicial." *Celenza v. Merdjanian*, No. CIV. A. 89–5921, 1990 WL 65759, at *3 (E.D. Pa. May 15, 1990), *aff'd*, 941 F.2d 1200 (3d Cir. 1991). *See also United States v. Coven*, 662 F.2d 162, 168 (2d Cir. 1981) ("Knowledge acquired by the judge while he performs judicial duties does not constitute grounds for disqualification." (citation modified)); *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 447–48 (2d Cir. 2005) ("Knowledge gained from the judge's discharge of his judicial function is not a ground for disqualification under 28 U.S.C. § 455(b)(1)." (citation modified)). At bottom, "[r]ecusal under the 'personal knowledge' prong of § 455 is proper only if, as the statute suggests, a judge's knowledge is personal or from 'an extrajudicial source,' rather than judicial, in nature." *Fed. Trade Comm'n v. Primary Grp. Inc.*, No. 1:15–CV–1645–MHC, 2015 WL 12977494, at *2 (N.D. Ga. June 4, 2015) (citing *United States v. Widgery*, 778 F.2d 325, 328 (7th Cir. 1985)). *See also Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisconsin, Inc.*, 991 F.2d 1249, 1255–56 (7th Cir. 1993) ("Facts learned by a judge in his or her judicial capacity regarding the parties before the court, whether learned in the same or a related proceeding, cannot be the basis for disqualification." (citation modified)).[2]

Having set forth what does and does not constitute extrajudicial conduct for § 455(b)(1) purposes, the Court turns to the specific events that Defendant identifies and

---

[2] Although not dealing with § 455 specifically, a case Defendant cites provides further illustration of what constitute "judicial acts": "The factors that determine whether an act by a judge is a 'judicial' one relate to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." *J.B. v. Washington Cnty.*, 127 F.3d 919, 926 (10th Cir. 1997) (citation modified). Explained further below, the parties' briefs show they certainly understood they "dealt with the judge in [her] judicial capacity" during the tour. *Id.* And the Court certainly attended the tour in its judicial capacity. *See id.; Coven*, 662 F.2d at 168.

discusses in his disqualification motion. *See also* ECF No. 210 at 2 (arguing the Court engaged in "three separate interactions" that warrant disqualification).

    ***The Introductory Conversation.*** According to Defendant, the Court's introductory conversation with the Warden and Attorney Willms was an extrajudicial, ex parte conversation that violates § 455(b)(1). *See, e.g.,* ECF No. 202 at 5. Says Defendant, "it is apparent that this initial ex parte conversation involved a discussion regarding who would be permitted to view the C Unit bubble, and that this ex parte conversation changed the judge's view on the issue." *Id.* at 19. This is wrong as a factual matter and presents no basis for § 455(b)(1) disqualification.[3]

    *First*, this argument proceeds from a flawed factual premise. Defendant bases this argument—and others in his motion—on a reading of the Court's March 19, 2026 email communication where, according to Defendant, the Court communicated that "all participants would be permitted to view the inside of the door across from Cell 40 and that either everyone would see the C Unit bubble during this tour or everyone would return

---

[3] The Court also observes that "ex parte" bears a specific definition, and under such definition no "ex parte" conversations occurred during the tour, as at no time did the Court hold a conversation with any *party* without the other present. *See, e.g., Zipris v. Ollada*, No. 22–cv–1402–WJM–SKC, 2023 WL 4838858, at *2 (D. Colo. July 28, 2023) ("An *ex parte* communication is one between counsel or a party and the court when opposing counsel or party is not present." (citation modified)). Further, the government correctly observes that, consistent with the other *recusal* authorities discussed below, "[m]ere speculation that an ex parte contact has occurred or that a judge was affected by it, however, does not warrant relief or further investigation." *Kaufman v. Am. Fam. Mut. Ins. Co.*, 601 F.3d 1088, 1095 (10th Cir. 2010) (citation modified). The parties cannot dispute that at no point during the tour did the Court speak to the government without Defendant's counsel present, which is consistent with the Court's statements during the January 22, 2026, status conference. *See* ECF No. 140 at 8 ("Both sides would need to be there, obviously, for that tour."). While Defendant cites cases that suggest the "ex parte" label may attach to a court's communications with non-parties, such as experts, such cases arose from a different factual background. Here, the Court made no reference, nor did it rely, on its viewing of certain areas in ruling on the parties' preservation motions which dealt solely with the preservation of footage. *Cf. United States v. Craven*, 239 F.3d 91, 101 (1st Cir. 2001) ("[A] sentencing court may not utilize an ex parte conversation with a court-appointed expert as a means to *acquire information critical to a sentencing determination* and then *rely on that information* in fashioning the defendant's sentence." (emphasis added)). *See also id.* at 103 n.3 ("We hasten to add that not every ex parte contact between a judge and court-appointed expert automatically will result in reversal." (citation modified)).

another time to view the bubble." *Id.* at 5; *see also id.* at 6 ("This statement represented a reversal from the Court's position set forth in the March 19 email that either everyone would see the bubble during the March 24 tour or another tour would be scheduled for a later date."). But the Court's communication said no such thing:

> Judge Sweeney is fine to proceed with the tour as confirmed by the Warden, but it should also include viewing inside of the door across from Cell 40 and the fire exit for that side of the range. She also believes that, given the pending issues concerning video footage, it is important to see the C Unit Bubble, if not on this tour then during one at some time in the future. Obviously, arranging to see the C Unit Bubble on the upcoming tour is preferrable than a return visit.

ECF No. 202-2 at 1.

There is *nothing* in this communication that states "either *everyone* would see the bubble during the . . . tour or another tour would be scheduled for a later date." ECF No. 202 at 6 (emphasis added). Instead, this communication simply states that the tour should also include viewing the door across from Cell 40, the fire exit, and that it would be important for the Court to see the C Unit Bubble—either during the March 2026 tour or in the future. Simply put, the plain language of the Court's communication does not bear the weight of Defendant's interpretation. This communication set forth the Court's specifications for what it should see on the tour—the door from across Cell 40, the fire exit, and the C Unit Bubble—as well as what it should not see—e.g., the gym and psychology area. *See* ECF No. 202-2 at 1.

*Second*—and notwithstanding Defendant's misinterpretation of the Court's communication—in arguing that the Court "reversed course and agreed to exclude the parties' attorneys from the portion of the tour that involved the C Unit bubble," ECF No. 202 at 19, following this introductory conversation, Defendant offers *no* evidentiary

support, *see id.* Defendant's earlier characterization of this conversation underscores the speculative nature of his argument: "ADX attorney Brandon Willms then approached Judge Sweeney and said that the Warden would like a chance to greet her. Judge Sweeney accompanied Attorney Willms out of the courtroom *presumably* to the Warden's nearby office." ECF No. 202 at 5 (emphasis added). *See also id.* at 18 ("Judge Sweeney engaged in multiple ex parte communications with Warden Jones and members of the ADX legal team. Other ADX officers and employees *may also* have been involved." (emphasis added)). And from these speculations, Defendant arrives at the conclusion that "it is *apparent* that this initial ex parte conversation involved a discussion regarding who would be permitted to view the C Unit bubble." *Id.* at 19 (emphasis added).

In addressing disqualification motions, courts are not required to recuse based on "conclusory, unsupported or tenuous allegations." *In re Kaminski*, 960 F.2d 1062, 1065 n.3 (D.C. Cir. 1992) (citation modified); *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir. 1987) ("A judge should not recuse himself on unsupported, irrational, or highly tenuous speculation." (citation modified)). Yet these are precisely what Defendant offers in seeking disqualification based on the introductory conversation: tenuous allegations as to what Defendant believes occurred without *any* evidence tending to support Defendant's speculations or characterizations of this event. *Cf. In re Kaminski*, 960 F.2d at 1065 n.3. The speculative nature of Defendant's argument is compounded by his misreading of the Court's March 2026 communication, discussed above. Simply put, the argument that the Court "reversed course," ECF No. 202 at 19, is premised both on a misinterpretation of

the Court's communication *and* on speculation as to what was said during the Court's introductory conversation with the Warden and Attorney Willms.[4]

To the extent that Defendant appears to argue such a conversation—or any conversation inside the C Unit Bubble or "control room"—bears relevance to any litigation that was "active" at the time regarding "the audio and video monitoring capabilities within Cell 40 on Range 13 and its accompanying areas," ECF No. 202 at 19, and that such issues were "pending before the Court" during the tour, *id.*, the Court notes that on the plain face of its order regarding Defendant's motion to compel the Court did not refer to *any* aspect of its tour in its analysis. Instead, the Court's April 7, 2026, order was concerned *entirely* with an interpretation and analysis of its own prior orders regarding the government's preservation obligations, and a discussion of the parties' briefs. *See generally* ECF No. 188. Contrary to Defendant's suggestion, the Court did not rely *at all* on any kind of impermissible, extrajudicial source in ruling on the parties' motions in its April 7, 2026, order. Again: Saying it does not make it so. *See Hinman*, 831 F.2d at 939 ("A judge should not recuse himself on unsupported, irrational, or highly tenuous speculation.").

In any event, Defendant himself appears to concede that the nature of the Court's analysis in its April 7, 2026 order—which didn't concern the tour *at all*—moots any disqualification concerns: "Counsel acknowledges that not every ex parte communication warrants recusal, particularly where the ex parte information *is not likely to impact the*

---

[4] The Court notes that § 455(b)(1) contemplates knowledge of "disputed evidentiary facts." The government argues that the Warden "had no personal knowledge" of the evidentiary facts giving rise to this case, "as he did not manage the prison at the time of the crime." ECF No. 209 at 10. Defendant does not dispute this. *See* ECF No. 202 at 10 ("Had Mr. Hillard not been moved to Cell 30, the circumstances that led to his death could not have occurred. Though Warden Jones *was not responsible for that decision*, he is now in charge of Mr. Petty's housing assignment on Range 13." (emphasis added)).

*judge's decisions.*" ECF No. 202 at 21 (citation modified). Defendant similarly concedes that "the Court ultimately decided the then-pending motions *without deciding* the contested facts regarding ADX's ability to preserve footage from audio and video devices, [yet] did so without prejudice to these issues being re-raised in the future." ECF No. 210 at 6 (citation modified)). Touring a facility did not impact how the Court interpreted the plain language of its prior orders or the parties' separate representations and arguments in their own briefs regarding the same.[5]

Accordingly, Defendant has failed to show that anything about the Court's introductory conversation with the Warden or Attorney Willms demands disqualification. *Cf.* § 455(b)(1).

***C Unit Bubble.*** As with the introductory conversation, Defendant argues that the Court's viewing of the C Unit Bubble amounts to an extrajudicial enterprise during which an ex parte communication occurred, *see, e.g.,* ECF No. 202 at 7, and thus demands disqualification. The Court disagrees.

*First*, and as discussed above, Defendant errs to the extent that he interprets the Court's March 19, 2026 communication as setting forth its position that "either everyone would see the bubble . . . or another tour would be scheduled for a later date." *Id.*; *see also id.* at 19. The Court has explained the flaws in this reading and declines to do so again here.

*Second*, Defendant argues that no one from his "defense team was permitted to be present during this viewing or to participate in any questioning or conversation that

---

[5] As for the point that these issues could be "re-raised in the future," *id.*, Defendant runs again into the problem that the specific content of any motions that would deal with these "issues" is unknown—and thus speculative—at this time, a problem compounded by the speculation Defendant offers as to what was said during these "interactions." *Cf. In re Kaminski*, 960 F.2d at 1065 n.3.

occurred related thereto." ECF No. 202 at 19. But once again, Defendant fails to set forth any evidence that rises above the speculative level as to what, if anything, the Court would have—or did—learn during this brief viewing that would have resulted in prejudice to him. *Cf. Hinman*, 831 F.2d at 939. Especially where, as discussed in the Court's analysis of the introductory conversation, the Court made no reference to, nor did it rely *at all* on *any* aspect of the tour, when ruling on the then-pending motions in its April 7, 2026 order. And all of this is separate and apart from the bedrock matter that the Court conducted its tour, including its brief viewing of the C Unit Bubble, in its *judicial* capacity— entirely consistent with § 455(b)(1). *See, e.g., Coven*, 662 F.2d at 168; *Omega Engineering*, 432 F.3d at 447–48; *Primary Group*, 2015 WL 12977494, at *2.

*Third*, Defendant argues that there are *future* issues to be litigated that will implicate "information communicated to the judicial officer by ADX personnel during their ex parte communications in the C Unit control room . . . ." ECF No. 202 at 20. The problem with this argument is that it presumes, without *any* evidentiary support, what was said or communicated in the C Unit Bubble. This is insufficient to garner disqualification. *See, e.g., In re Kaminski*, 960 F.2d at 1065 n.3 ("A judge should not recuse himself based upon conclusory, unsupported or tenuous allegations." (citation modified)).[6] The only support Defendant appears to offer in support of this argument is the notion that after the "ex parte conversation in the C Unit control room, the judicial officer changed her position" on whether counsel "would be permitted to see what was behind the door directly across from [Defendant's] cell." ECF No. 202 at 20. But again: That was not the Court's position.

---

[6] Indeed, Defendant inaugurates his motion with such speculation: "[Defendant] moves to disqualify . . . as the judge *obtained information related to disputed issues* in this case from extrajudicial sources . . . ." ECF No. 202 at 1 (emphasis added). This, like much of Defendant's motion, presumes too much with too little evidence.

11

Defendant is wrong to suggest otherwise *and* to suggest any "ex parte conversation," *id.*, reversed a course the Court never charted.

*Fourth*, the argument that "after the Warden and judge emerged from their ex parte interaction in the C Unit bubble" the *Warden himself* changed position on who would see "the area behind" the door directly across from Defendant's cell, *id.*, likewise fails because it too relies on tenuous and speculative allegations. *See, e.g., In re Kaminski*, 960 F.2d at 1065 n.3; *Hinman*, 831 F.3d at 939.

Accordingly, the Court agrees with the government that Defendant has failed to show that anything about the Court's brief viewing of the C Unit Bubble demands disqualification. *Cf.* § 455(b)(1); ECF No. 20 at 8 ("[T]he defendant has not identified any conduct that might have improperly caused the Court to abandon its objectivity.").

**Door Across Cell.** Finally, Defendant challenges the Court's "private viewing," ECF No. 202 at 21, of the door across from Defendant's cell as an extrajudicial act and form of ex parte communication that warrants disqualification. For virtually the same reasons the Court rejects Defendant's other *disqualification* arguments, so too does it reject Defendant's challenge to the Court's viewing of this door. There is simply no evidence to show that any communications were improper, or even held, or performed beyond the Court's judicial role, such that they were improperly ex parte or extrajudicial in contravention of § 455(b)(1). *See, e.g., In re Kaminski*, 960 F.2d at 1065 n.3; *Hinman*, 831 F.3d at 939.[7]

---

[7] The Court also questions the materiality of this viewing, given that Defendant has advanced arguments about this door as a matter of Defendant's conditions of confinement. As previously explained, *see* ECF No. 188 at 5 n.2, in this criminal case the Court declines to consider matters, or order relief, related to the *conditions of confinement* that are civil in nature.

* * *

The Court has reviewed Defendant's disqualification motion. And in the interest of justice, the Court has addressed all arguments it has identified that attend Defendant's challenges under § 455(b)(1)'s "personal knowledge" provision. These fail, however, due to their inherently speculative nature, and because the Court was engaged in its judicial capacity, *see, e.g., United States v. Patrick*, 542 F.2d 381, 390 (7th Cir. 1976), during the tour. *See also Hale v. Firestone Tire & Rubber Co.*, 756 F.2d 1322, 1329 (8th Cir. 1985) ("Facts learned by a judge in his judicial capacity cannot be the basis for disqualification." (citation modified)). Particularly where the Court's tour was "undisputably conducted as part of the instant proceeding," *LaMarca v. Turner*, 662 F. Supp. 647, 654 (S.D. Fla. 1987) (citation modified), and Defendant has put forth *no* evidence tending to support his contention that throughout the tour the Court "*obtained information* from an extrajudicial source about issues that have been or will be disputed in this case," ECF No. 202 at 23 (emphasis added), that amounts to actual partiality. *See Burke v. Regalado*, 935 F.3d 960, 1053–54 (10th Cir. 2019) ("Section 455(a) requires disqualification for the appearance of impartiality, § 455(b)(1) for *actual partiality*." (citation modified)).[8] As the

---

[8] The D.C. Circuit has concluded that where "the proffered evidence of *ex parte* meetings between the court and its agents . . . [did not] show the judge had acquired personal knowledge of disputed evidentiary facts," petitioners had thus "failed to show the 'clear and indisputable right' to relief that is required." *In re Brooks*, 383 F.3d 1036, 1043 (D.C. Cir. 2004) (citation modified). The Court notes the Tenth Circuit applies the same "clear and indisputable" right standard for parties seeking a writ of mandamus from district courts' denial of recusal motions. *See, e.g., In re Trierweiler*, 570 F. App'x 766, 774 n.6 (10th Cir. 2014) ("But because mandamus remains an extraordinary remedy, we require that a petitioner seeking mandamus relief must demonstrate a clear abuse of discretion, as well as a *clear and indisputable right to relief*." (citation modified)). In ruling on Defendant's motion the Court—as a district court—is simply holding Defendant to his "heavy" § 455 burden. *Topeka Hous. Auth. v. Johnson*, 404 F.3d 1245, 1248 (10th Cir. 2005) (citation modified).But query whether the evidence Defendant has—and, more significantly, has not—put forward would warrant the "extraordinary remedy" of mandamus, *id.*, where appellate review of the Court's determination that recusal is improper would require application of this *clear and indisputable* right standard, as well as *abuse of discretion* review. *See id.*

13

government succinctly observes, Defendant "cannot sustain his assertion that § 455(b)(1) requires disqualification. [He] has not identified any information from the tour that relates to a substantive issue in this case, much less has he shown that the [Court] used such information to decide a litigated question." ECF No. 209 at 11.[9]

### B.  28 U.S.C. § 455(a)

Defendant next seeks disqualification under § 455(a). *See* ECF No. 202 at 23. According to Defendant, "a reasonable person would question the court's impartiality after its ex parte interactions" during the tour. *Id.* The Court disagrees and rejects Defendant's disqualification challenge under § 455(a).

Section 455(a) provides that any judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Given these "statutory parameters," courts "must determine whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." *Nichols v. Alley*, 71 F.3d 347, 350–51 (10th Cir. 1995) (citation modified). However, "a judge has as much obligation not to recuse himself where there is no reason to do so as he does to recuse himself when the converse is true." *United States v. Greenspan*, 26 F.3d 1001, 1005 (10th Cir. 1994) (citation modified). The party seeking disqualification bears a "heavy burden of showing the requisite judicial bias or misconduct." *Topeka Housing Authority*, 404 F.3d at 1248 (citation modified).

---

[9] This argument refutes Defendant's contention that "there is no dispute that the *ex parte* interactions occurred or that they impacted (or at least had the appearance of impacting) judicial decision-making in this case." ECF No. 210 at 1. As this quotation—and the entirety of the government's response brief—should and does make clear, the government *does* dispute that such interactions were "ex parte" and impacted the Court's decision-making.

14

In urging disqualification under § 455(a), Defendant relies—as he does in advancing his § 455(b)(1) arguments—on the Court's purported acquisition of "extrajudicial" information during the tour. *See, e.g.,* ECF No. 202 at 24. Specifically, that the Court improperly viewed the C Unit Bubble before denying Defendant's motion to compel. *See id.* at 25. But no "reasonable person, knowing all the relevant facts," *Greenspan*, 26 F.3d at 1005 (citation modified), would question the Court's impartiality when its April 7, 2026, ruling on the motion to compel was not, as discussed above, based *at all* on *any* aspect of the tour. Instead, such ruling and the Court's analysis were premised *entirely* on the Court's prior orders and resolving the parties' competing interpretations of their plain language. *See generally* ECF No. 188. Nor has Defendant shown that his speculative, unsupported characterization of the Court's visitation to the C Unit Bubble raises concerns for an objectively reasonable person as to the Court's impartiality, particularly where Defendant has not shown that the viewing has given the Court any appearance of a partial interest the litigation.[10] *Compare* ECF No. 202 at 26, *with Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988) ("*If* it would

---

[10] Regarding Defendant's motion and the parties' dispute regarding preservation, the Court observes that defense counsel was aware that recordings "are typically retained on the BOP system for 20 to 30 days." ECF No. 198 at 1. This is consistent with Defendant's own representation in the motion to compel, where Defendant stated the BOP retained recordings for, at a minimum, ten days, and at a maximum thirty days. *See* ECF No. 173 at 14. *See also id.* ("Prosecutors agreed to work with BOP to obtain and produce 30 days of all audio and video recordings of [Defendant] at ADX."). In an exhibit submitted with Defendant's reply, defense counsel requested video and audio recordings from the March 24, 2026 tour on April 23, 2026 at 9:49 p.m. *See* ECF No. 210-1 at 1. The Court observes that defense counsel—not withstanding numerous observations across various filings—waited until 9:49 p.m. on the thirtieth day to request such a production, when it was clear the BOP's maximum timeframe for preservation was set to expire the same date that defense counsel sent its April 23 email. It should come as no surprise to Defendant and defense counsel that such a delay—a mere *hours* before midnight—runs the risk of these requested recordings becoming unretrievable, even where the government sent such a preservation request to the BOP the following day, April 24. *See* ECF No. 210-1 at 1. The Court can address parties' arguments about preservations in motions they file. It cannot—nor would it—monitor or control decisions that defense counsel make, notwithstanding the obvious risk that such a delayed decision posed, coupled with defense counsel's failure to explain such a delay in any filing.

15

appear to a reasonable person that a judge has knowledge of facts that would give him *an interest in the litigation* then an appearance of partiality is created." (citation modified)); *and Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 659–60 (10th Cir. 2002) ("The recusal statute should not be construed so broadly as to become presumptive or to require recusal based on *unsubstantiated suggestions* of personal bias or prejudice." (citation modified)); *U.S. Bank Nat'l Ass'n v. Poblete*, No. CV 15–312 (BAH), 2015 WL 13866411, at *2 (D.D.C. July 24, 2015) ("[T]he defendant fails to set forth sufficient facts or circumstances demonstrating personal bias or prejudice. His statements are, at best, general and conclusory.").[11] And to be clear, the Court has no such partial interest in this case in favor of either party, nor has it "prejudged" any aspect of this case, including the phases of Defendant's trial. Absolutely nothing about the Court's purportedly "ex parte" communications—or anything else that occurred during the tour—has changed this. *Cf. United States v. Woodmore*, 135 F.4th 861, 873 (10th Cir. 2025) ("Ordinarily, when a judge's words or actions are motivated by events *originating within the context of judicial proceedings*, they are insulated from charges of bias . . . . [But] courts have found an impermissible level of bias when a judge's remarks or actions reveal he has *prejudged the guilt of a defendant*." (citation modified)); *United States v. Liddy*, 509 F.2d 428, 438–39 (D.C. Cir. 1974) (observing "judicial excess" arises where "[a] trial judge either creates an appearance of partiality by *continued intervention on the side of one of the parties* or undermines the effective functioning of counsel through repeated interruption of the examination of witnesses" (citation modified)).

---

[11] The First Circuit has explained the soundness of this principle: "Were less required, a judge could abdicate in difficult cases at the mere sound of controversy or a litigant could avoid adverse decisions by alleging the slightest of factual bases for bias." *In re United States*, 666 F.2d 690, 695 (1st Cir. 1981).

In sum, for substantially the same reasons that disqualification under § 455(b)(1) is required, Defendant has failed to show that, under § 455(a), a reasonable person, knowing all of the relevant facts, would "harbor doubts" about the Court's impartiality in this case. *Bryce*, 289 F.3d at 659 (citation modified); *Nichols*, 71 F.3d at 350–51. *See also Georgelas v. Hill*, No. 2:21–cv–00441–RJS–DAO, 2022 WL 1443068, at \*8 (D. Utah May 6, 2022) ("Indeed, rumor, speculation, beliefs, conclusions, innuendo, suspicion, opinion and similar non-factual matters are not ordinarily sufficient to require § 455(a) recusal." (citation modified)).[12] Nor would such a reasonable person conclude, after reviewing these relevant facts, that the Court "harbors an *aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute.*" *Burke*, 935 F.3d at 1054 (citation modified).[13]

---

[12] Compounding this error is Defendant's inability to identify with factual specificity what did or did not occur during such interactions. *See, e.g., Williams v. Pierce Cnty. Bd. of Comm'rs*, 267 F.2d 866, 867 (9th Cir. 1959) (concluding in § 144 recusal analysis that even where "an affidavit had been filed by plaintiff charging the judge with bias," the district court "properly disregarded" the affidavit's allegations where it "stated no facts showing bias").

[13] Consistent with this conclusion, the Court determines that two cases upon which Defendant relies are materially distinguishable. In *Edgar v. K.L.*, the district court met for 3.5 hours with a panel of experts, and their meeting "was dedicated to giving the judge a preview of the panel's conclusions, and to persuading the judge that the panel's methodology was sound." 93 F.3d 256, 257 (7th Cir. 1996). This is not a case where the Court participated in a meeting intended to "anticipate and preempt an important legal question." *Id.* at 260. Nor has Defendant put forth any evidence showing that, unlike the experts in *Edgar*, the Court encountered individuals in its viewing who "had become *partisans*" in this litigation. *Id.* (emphasis added). Similarly, the Third Circuit determined recusal was required where the district court met numerous times with "parties and their attorneys" at, for example, "restaurants over lunch or dinner or at law firms." *In re Kensington Int'l Ltd.*, 368 F.3d 289, 297 (3d Cir. 2004). The Court has held no such meetings with one party's attorneys at the exclusion of another. Moreover, at no point during the tour did the Court discuss anything that attends the merits or legal issues in this case. *Cf. id.* (observing judge held "four *ex parte* meetings at which [advisors] discussed 'just whatever issue you can think of,' including claims bar dates, the chrysotile defense, proof of claim forms, pleural plaques, the pros and cons of various approaches to estimation under 11 U.S.C. § 502(c), the tensions between various creditor classes, and Rule 706 panels"). Further, and unlike here, the Third Circuit was confronted with actual evidence regarding the at-issue communications and their discussions of merits issues in the underlying proceedings: "We *know*, for instance, that someone at one of the meetings disparaged a *possible expert witness* and *criticized a defense.*" *Id.* at 311 (emphasis added).

The Court offers one final note. As observed above, the Court has "as much an obligation not to recuse himself where there is no reason to do so as he does to recuse himself when the converse is true." *Greenspan*, 26 F.3d 1005. Explained above, Defendant has failed to meet his "heavy burden," *Topeka Housing*, 404 F.3d at 1248, that the converse *is* true. *See also In re United States*, 666 F.2d at 695. Regardless, accepting Defendant's "unjustified recusal" arguments could induce precisely the *impartiality* problem about which Defendant complains: "[U]njustified recusal under § 455(a) could encourage the perception that litigants can manipulate the system to veto an unwanted judge . . . . [T]his would be damaging to public confidence in the administration of justice." *Arkansas Tchr. Ret. Sys. v. State St. Bank & Tr. Co.*, 404 F. Supp. 3d 486, 519 (D. Mass. 2018). *Cf. United States v. Martinez*, 92 F.4th 1213, 1256 (10th Cir. 2024) ("[A] judge has a continuing duty to recuse before, during, or, in some circumstances, after a proceeding, if the judge concludes that *sufficient factual grounds exist to cause an objective observer reasonably to question* the judge's impartiality." (citation modified)).

The Court will not damage such public confidence. Especially where "[i]t is evident that this will continue to be a demanding case," *Arkansas Teacher Retirement System*, 404 F. Supp. 3d at 519, and after that careful consideration recusal would amount to "an abdication of professional responsibility," *id.* The Court, as it refuses to damage public confidence, likewise refuses to abdicate its responsibilities.

### III.    CONCLUSION

Consistent with the above analysis, Defendant's Motion to Disqualify, ECF No. 202, is DENIED.

18

DATED this 28th day of May 2026.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge