**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No. 25-cr-00123-CNS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ISHMAEL PETTY,

      Defendant.

---

**MOTION FOR ORDER PERMITTING THE PARTIES TO VIEW THE CONTROL BUBBLE IN C UNIT AND THE AREA BEHIND THE DOOR ACROSS THE HALL FROM CELL 40 ON RANGE 13 UNDER A PROTECTIVE ORDER**

---

Ishmael Petty, through undersigned counsel, seeks a Court order directing the Bureau of Prisons to permit attorneys for the Government and the defense, subject to a protective order, to view the C Unit Bubble and the area behind the "fire exit" door across from cell 40 on Range 13. The government takes no position on this request. The Bureau of Prisons objects.

### Factual Background

The facts of this case have been recited several times in previous pleadings. The facts surrounding this request are recited in Documents 202, 209, 210, and 213. The relevant facts for this motion appear not to be in dispute.

During a January 22, 2026, status conference, the Court stated that "it would be helpful for the Court to do a tour of the facility." Doc. 140. The parties did not object. A tour was scheduled for March 24, 2026.

Prior to the tour, Mr. Petty's defense team suggested the Court's tour should

1

include, among other areas, inside the door across from Cell 40 and the C Unit Bubble. The BOP, through the government, objected to these areas being toured.

On March 24, the Court, two law clerks, and the parties toured Cells 30 and 40 on Range 13, as well as the recreation areas and law libraries associated with these cells. The Court toured the C Unit Bubble accompanied only by BOP officials; counsel was not permitted to attend this portion of the tour. The Court and her two law clerks viewed the area behind the door across from Cell 40 accompanied by BOP officials; counsel was not present.

The Court encouraged counsel to confer regarding a protective order that would permit counsel to view the area behind the door across from Cell 40 and access to the C Unit Bubble. The Court also encouraged a motion to be filed if an agreement could not be reached regarding access to these areas.

On March 25, 2026, counsel for Mr. Petty emailed counsel for ADX to confer about a protective order that would allow defense counsel to view the area behind the door across from Cell 40 and the C Unit Bubble. Ex A. That same day, counsel for ADX responded as follows: "Warden Jones did not and will not agree to a protective order for the parties to view those areas. He provided access to the Court, that's it." *Id*. Counsel for Mr. Petty recently contacted counsel for the government to get their position on joint access to these areas subject to a protective order. Counsel for the government takes no position. This motion follows.

**Defense Counsel Must Have Broad Access to Information that May Implicate Mitigating Factors or Rebut Aggravation Evidence**

In a capital case, the government's disclosure obligations differ significantly compared to those obligations in the non-capital context. Unlike the provisions

governing non-capital federal sentencing before a judge, the Federal Death Penalty Act sets forth several statutory mitigating factors that a jury is required to consider, including impaired capacity, duress, mental or emotional disturbance, and a catchall – "Other factors in the defendant's background, record, or character or *any other circumstance of the offense* that mitigate against imposition of the death sentence." 18 U.S.C. §3592(a) (emphasis added).

The Supreme Court has explained that capital mitigation may include "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less that death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). It has referred to mitigation in the capital context having "virtually no limits." *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (quoting *Eddings v. Oklahoma*, 455 U.S. 104 (1982)).

Thus, in a capital case, due process requires the government to disclose not only evidence that would be favorable to the defense at trial, but also evidence that would be favorable at sentencing, *i.e.*, that would help establish mitigating factors or weaken or counter aggravating ones. *See*, *e.g., Brady v. Maryland*, 373 U.S. 83, 87-88 (1963) (requiring disclosure of material that "would tend to exculpate him or deduce the penalty" from death to life imprisonment). The government's *Brady* obligation extends well beyond what is required in a non-capital matter. *See, e.g., United States v. Storey*, 956 F. Supp. 934, 939-40 (D. Kan. 1997) ("*Brady* therefore mandates discovery concerning [the] mitigating factors [in 18 U.S.C. §3592(a).]"); *United States v. Saenz*, F. Supp. 3d 188, 193-94 (E.D.N.Y. 2022) ("Because the Notice of Intent specifies the aggravating factors upon which the Government intends to rely, it fundamentally alters

the Government's disclosure obligations. . . [O]nce the Government files the Notice of Intent listing aggravating factors, [Rule 16 and *Brady*] obligations broaden to include information that may rebut the aggravators or buttress potential mitigators.").

The meaning of "favorable" under *Brady* includes any information in the "actual or constructive" possession of the government that relates to guilt or punishment and tends to *help* the defense by either bolstering the defense case or impeaching potential prosecution witnesses. *United States v. Lujan*, 530 F. Supp. 2d 1224, 1231 (D.N.M. 2008); *Safavian*, 233 F.R.D. at 16. It covers both exculpatory and impeaching evidence. *United States v. Bagley*, 473 U.S. 667, 676-677 (1985). "'The government is obligated to disclose all evidence relating to guilt or punishment which might be reasonably considered favorable to the defendant's case,' that is all favorable evidence that is itself admissible or 'that is likely to lead to favorable evidence that would be admissible' . . ." *Safavian*, F.R.D. at 17 (quoting *United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1999-1200 (C.D. Cal. 1999)). "Where doubt exists as to the usefulness of the evidence to the defendant, the government must resolve all such doubts in favor of full disclosure." *Id*. (citing *United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988)); *see Dennis v. Sec., Pennsylvania Dept. of Corrections*, 834 F.3d 263, 293 (3d Cir. 2016) ("All favorable material ought to be disclosed by the prosecution."); *United States v. Olsen*, 704 F.3d 1172, 1183 n.3 (9th Cir. 2013) ("A trial prosecutor's speculative prediction about the likely materiality of favorable evidence, however, should not limit the disclosure of such evidence, because it is just too difficult to analyze before trial whether particular evidence ultimately will prove to be 'material' after trial.").

In addition to what the government must affirmatively disclose under *Brady*, the

broad scope of what may be considered in aggravation or mitigation during the penalty phase of a capital case affects what the defense team must be allowed to investigate in order to provide effective representation. The Supreme Court recognizes that it is important to provide a capital defendant the opportunity to rebut future dangerousness arguments:

> Where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule of *Lockett* and *Eddings* that requires that the defendant be afforded an opportunity to introduce evidence on this point; it is also the elemental due process requirement that a defendant not be sentenced to death "on the basis of information which he had no opportunity to deny or explain."

*Skipper v. South Carolina*, 476 U.S. 1, 5 n.1 (1986) (quoting *Gardner v. Florida*, 430 U.S. 349, 362 (1977)); *Simmons v. South Carolina*, 512 U.S. 154, 169 (1994) (due process requires opportunity for defendant to "deny or explain" a showing of future dangerousness); *see also Kelly v. South Carolina*, 534 U.S. 246, 254 (2002) (even where government does not directly assert future danger but merely presents evidence "with a tendency to prove dangerousness in the future," the defense must have opportunity to rebut this evidence of future dangerousness). Counsel would be ineffective if they failed to fully investigate and demand that the government disclose information that could rebut its future dangerousness argument.

The same is true for evidence related to conditions of confinement and potential policy failures and/or violations by correctional officials. In many capital cases, juries have found conditions of confinement mitigating, as well as ineptitude on the part of the BOP. *See, e.g.,* Doc. 173-4 (wrongful actions of BOP employees in transporting and escorting defendant were mitigating against death penalty); 173-5 (same); Ex. B, W.

Sablan Verdict form (multiple jurors found mitigating that "[t]he circumstances that led to [the victim's] death existed, at least in part, because of failure(s) by BOP officials to do their job(s)."); Ex. C, R. Sablan Verdict form (same).

**Viewing of the Requested Areas is Important for Preparation of the Defense**

The government filed a Notice of Intent to seek the death penalty. Doc. 7. Among the aggravating factors listed to justify a death sentence are that Mr. Petty "is a continuing danger to the lives and safety of other persons" and that Mr. Petty "is likely to commit criminal acts of violence in the future." *Id*. As Mr. Petty is serving a life sentence, these aggravators require the prosecution to show that Mr. Petty is a danger to the "lives and safety" of persons inside ADX and that he is "likely to commit criminal acts of violence" while incarcerated at ADX.

The Court previously ordered the Bureau of Prisons (BOP) to provide Mr. Petty's defense team with a tour ADX. Doc. 165. That tour included a viewing of Cells 40 and 30, indoor recreation for Cells 40 and 30, and outdoor recreation for Cell 40 of Range 13. The previous tour did not include viewing the area behind the door across from Cell 40 and the C Unit Bubble.

Given the importance of the issues related to future dangerousness in this case, when the Court suggested a tour accompanied by counsel for both sides, Mr. Petty's defense requested that such tour include the C Unit Bubble and the area behind the door across from Cell 40. The Court was permitted to view those areas; counsel was not. As set forth below, preparation of Mr. Petty's defense requires that counsel be allowed to view these areas.

6

*C Unit Bubble*

The C Unit Bubble is where the video and audio feeds for Range 13 are monitored by ADX staff. The BOP After Action Report related to this case recommends, among other things, that staff should not have to change screens to monitor what is happening in Cell 40 on Range 13. Seeing whether or not that change has been made is directly relevant to ADX's current monitoring capabilities, which relates to potential mitigation evidence. Similarly, ADX recently hardened Cell 30 and is now rotating Mr. Petty between Cell 30 and Cell 40. Thus, whether the C Unit bubble shows a continuous feed from Cell 30 is also necessary information for the defense. ADX's monitoring capabilities for the areas where Mr. Petty is housed affect the security of ADX and the safety of staff and inmates alike. All of this information is relevant to the government's claim that Mr. Petty is a future danger, which will be a primary focus during any penalty phase of trial in this case.

Moreover, the audio and video recording capabilities of Range 13 continue to be in question. *See* Motion for Evidentiary Hearing on Audio/Video Capabilities on Range 13, filed contemporaneously herewith. A viewing of the C Unit Bubble and a discussion with the operator assigned to monitor those feeds is important investigation for the defense given these ongoing issues.

*The Area Behind the Door Across from Cell 40*

Mr. Petty is concerned that ADX staff manipulate the temperature of his cell and the temperature of his water from the pipe chase for his cell, regardless of whether he is housed in Cell 40 or Cell 30. He is concerned that staff access the pipe chase through the doorway across from his cell or the other side of that door, away from his view. Mr.

7

Petty's conditions of confinement are relevant to issues of mitigation as well as the government's noticed, non-statutory aggravator – future dangerousness.

BOP has represented that this door is a "fire exit" that is rarely used and which requires extra paperwork if opened or accessed. Yet video provided to the defense from the Range 13 hallway shows that more than seven ADX officials accessed that door on a single morning.

Allowing counsel to view the area behind the door would confirm whether that door may be used to access Mr. Petty's pipe chase. If it can, further inquiry may be necessary. If it cannot, permitting counsel to see this area should resolve the issue and obviate the need for future litigation on this issue.

### Mr. Petty's Counsel Takes No Issue with Any Viewing Being Subject to a Protective Order

The defense team has offered and remains willing to view the requested areas subject to a protective order that would restrict the team from sharing sensitive security information with Mr. Petty. The parties have agreed to a similar type of order applying to "sensitive information on other inmates" disclosed in discovery production. *See* Doc. 216. Despite this offer, ADX is still unwilling to allow Mr. Petty's defense team access to these two areas.

### Conclusion

For the reasons set forth above, the defense asks the Court to order the Bureau of Prisons to allow viewings of the C Unit Bubble and the behind the door across from Cell 40 subject to a protective order restricting counsel's ability to share sensitive information with Mr. Petty.

8

DATED: June 26, 2026

Respectfully submitted,

*s/Jamie Hubbard*

Tim Burdick, #78152
Assistant Federal Public Defender
500 State Avenue, Suite 201
Kansas City, KS 66101
913-551-6712
Tim_Burdick@fd.org

Jamie Hubbard, #48552
Kathryn Stimson, #36783
Stimson LaBranche Hubbard, LLC
1652 Downing Street
Denver, Colorado 80218
720-689-8909
Hubbard@slhlegal.com
stimson@slhlegal.com

*Attorneys for Ishmael Petty*

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2026, a true copy of the foregoing document was electronically filed via CM/ECF and will be served to all parties in this case.

*s/ Nancy Hickam*
Nancy Hickam, Paralegal

9